O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PET CHALET, INC., A CALIFORNIA CORPORATION, AND WASSIM A. MASSOUD, | ) ) ) ) ) | Case No. EDCV 13-01439-VAP (KKx) |
| Plaintiffs, | ) ) | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | **[Motion filed on May 1, 2015 (Doc. No. 161)]** |
| COUNTY OF RIVERSIDE, et al., | ) ) ) | |
| Defendants. | ) ) | |

In this case, Plaintiffs Wassim A. Massoud, a man of "Lebanese Arab ethnicity," and the dog grooming and kenneling business he owns, Pet Chalet, Inc. (collectively, "Massoud"), bring claims of discrimination, contending that Defendant County of Riverside ("Riverside County" or just "County"), and various County employees had a policy of favoring Caucasian business owners, to the detriment of people of "Arabic" descent.  He alleges that the County discriminated against him when it allowed a Caucasian-

owned business to operate a competing dog kennel without the required permits, while at the same time requiring him to obtain a permit to operate a similar business in the same area.

On May 1, 2015, Defendant Riverside County and individual defendants Frank L. Coyle, Carolyn Syms Luna, Gregory A. Neal, Juan Perez, and Larry Ross (sometimes referred to as the "individual defendants") filed a Motion for Summary Judgment ("MSJ" or "Motion"). (Doc. No. 161.) For the reasons stated below, the Court GRANTS the Motion.

## I. PROCEDURAL HISTORY

Massoud filed this action on August 14, 2013. (Doc. No. 1.) After motion practice, Massoud filed a Second Amended Complaint ("SAC") on October 30, 2014. (Doc. No. 116.) The SAC contains the following claims: (1) denial of equal protection, in violation of 42 U.S.C. § 1983 (against all defendants) and (2) a Monell claim against Riverside County.[1]

After further motion practice and withdrawal of Massoud's original counsel of record, Defendants filed the MSJ on May 1, 2015, seeking summary judgment as to

---

[1]     Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 690–91 (1978).

1   both claims in the SAC.  Along with the MSJ, Defendants

2   filed:

3

4   •   The Declaration of Juan Perez ("Perez Decl.")

5       (Doc. No. 161-1)[2];

6   •   The Declaration of Frank L. Coyle ("Coyle

7       Decl.") (Doc. No. 161-2);

8   •   The Declaration of Robert Magee ("Magee Decl.")

9       (Doc. No. 161-3);

10  •   The Declaration of Tamara Harrison ("Harrison

11      Decl.") (Doc. No. 161-4);

12  •   The Declaration of Gregory A. Neal ("Neal

13      Decl.") (Doc. No. 161-5)

14  •   The Declaration of Carolyn Syms Luna ("Luna

15      Decl.") (Doc. No. 161-6), which attaches

16      Exhibits 1-3 (Doc. Nos. 161-7 to 161-9);

17  •   The Declaration of Larry Ross ("Ross Decl.")

18      (Doc. No. 161-10), which attaches Exhibits 4-5

19      (Doc. Nos. 161-11 to 161-12);

20  •   The Declaration of Douglas C. Smith (Doc. No.

21      161-13), which attaches Exhibits 6-7 (Doc. No.

22      161-14 to 161-15);

23  _____

24      [2]   When Perez's declaration was filed initially, it
    lacked his signature.  Defendants filed a Notice of

25  Errata on May 4, 2015 bringing this to the Court's
    attention, and submitting a signed declaration.  (Doc.

26  No. 164.)  Defendants also submitted Perez's signed
    declaration along with their Reply.  (Doc. No. 184-1.)

27  The Court finds that Perez's declaration was filed
    timely, and accordingly, OVERRULES any objections to

28  Perez's declaration on this basis.

3

1    •    The Declaration of Aaron Clark (Doc. No. 161-
2         16), which contains its own Exhibit A (Doc. No.
3         161-17);
4    •    The Declaration of Douglas Sparr (Doc. No. 161-
5         18), which contains its own Exhibit A (Doc. No.
6         161-19);
7    •    The Declaration of Dale Goldsmith (Doc. No. 161-
8         20), which attaches its own Exhibit A (Doc. No.
9         (Doc. No. 161-21);
10   •    The Declaration of Christopher A. McIntire (Doc.
11        No. 175-1), which attaches Exhibit 8 (Doc. No.
12        175-2)[3]; and
13   •    A Statement of Uncontroverted Facts and
14        Conclusions of Law ("Defs' UMF") (Doc. No. 162).

16   After the Court granted an extension for Massoud's
17   new counsel of record to respond to the MSJ, Massoud
18   filed an Opposition to the MSJ on June 22, 2015
19   ("Opp'n").  (Doc. No. 179.)  Along with the Opposition,
20   Massoud filed:
21   •    The Declaration of Steven M. Hoslett ("Hoslett
22        Decl.") (Doc. No. 179-5), which attaches
23        Exhibits 1-4;

26   [3]   Defendants initially requested leave to file
Exhibit 8 under seal.  (Doc. No. 163.)  The Court denied
27   that request.  (Doc. No. 174)  Defendants then filed
Exhibit 8 in the public record on May 14, 2015.  (Doc.
28   No. 175.)

4

1    • The Declaration of Imad Y. Elias ("Elias
2       Decl."), which is attached to the body of the
3       Opposition, and attaches Exhibits 5-8 (Doc. Nos.
4       179-1 to 179-3 and 179-6 to 179-8);
5    • The Declaration of Wassim A. Massoud ("Massoud
6       Decl."), which is attached to the body of the
7       Opposition, and attaches Exhibit A (Doc. No.
8       179-9); and
9    • The Declaration of Richard M. Kos ("Kos Decl.")
10      (Doc. No. 179-4), and attaches its own
11      Exhibit A;
12   • A Statement Opposing Genuine Issues in Dispute
13      on Motion of Defendants for Summary Judgment
14      ("Plfs' UMF") (Doc. No. 178); and
15   • Plaintiffs' Evidentiary Objections ("Plfs'
16      Objs.") (Doc. No. 180).
17
18   On June 29, 2015, Defendants filed their Reply.
19   (Doc. No. 182.)  Along with their Reply, Defendants
20   filed:
21   • A Reply to Plaintiffs' Evidentiary Objections
22      (Doc. No. 183);
23   • A second Declaration of Christopher A. McIntire
24      (Doc. No. 184), attaching Exhibits 1-3 (Doc.
25      Nos. 184-1 to 184-3);
26
27
28

1      •   Objections to Plaintiffs' Evidence Submitted in

2           Opposition to the Motion for Summary Judgment

3           ("Defs' Objs.") (Doc. No. 185); and

4      •   A Reply to Plaintiffs' Opposition to Statement

5           of Uncontroverted Facts and Conclusions of Law

6           (Doc. No. 186).

7

8                **II. EVIDENTIARY RULINGS**

9     Before setting forth the uncontroverted facts in this

10 action, the Court examines the admissibility of the

11 evidence offered by both sides in support of, and

12 opposition to, the MSJ.  "A trial court can only consider

13 admissible evidence in ruling on a motion for summary

14 judgment." <u>Orr v. Bank of America</u>, 285 F.3d 764, 773

15 (9th Cir. 2002).  At the summary judgment stage, district

16 courts consider evidence with content that would be

17 admissible at trial, even if the form of the evidence

18 would not be admissible at trial.  <u>See</u> <u>Fraser v. Goodale</u>,

19 342 F.3d 1032, 1036 (9th Cir. 2003); <u>Block v. City of Los</u>

20 <u>Angeles</u>, 253 F.3d 410, 418-19 (9th Cir. 2001).  Moreover,

21 "objections to evidence on the ground that it is

22 irrelevant, speculative, and/or argumentative, or that it

23 constitutes an improper legal conclusion are all

24 duplicative of the summary judgment standard itself" and

25 thus need not be considered on a motion for summary

26 judgment.  <u>Burch v. Regents of Univ. of California</u>, 433

27 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).

28

1   Massoud has submitted seventy-one evidentiary
2  objections and Defendants submitted twenty-two.  As it is
3  "often unnecessary and impractical for a court to
4  methodically scrutinize each objection and give a full
5  analysis of each argument raised," and because many of
6  the objections are "boilerplate recitations of
7  evidentiary principles or blanket objections without
8  analysis applied to specific items of evidence," to the
9  extent the Court has relied on objected to evidence, it
10  has only relied on admissible evidence and those
11  objections are overruled.  <u>Stonefire Grill, Inc. v. FGF</u>
12  <u>Brands, Inc.</u>, 987 F. Supp. 2d 1023, 1033 (C.D. Cal.
13  2013).  The Court addresses some objections below.
14
15  **A.  Massoud's Objections**
16   Massoud objects broadly to statements made in
17  declarations submitted in support of the MSJ, on the
18  ground that the declarant lacked personal knowledge of
19  the subject at issue.  (<u>See, e.g.</u>, Plfs' Objs. 2-6; 9-
20  15.)  A declarant must show personal knowledge and
21  competency to testify by the facts stated.  <u>Bank Melli</u>
22  <u>Iran v. Pahlavi</u>, 58 F.3d 1406, 1412 (9th Cir. 1995); Fed.
23  R. Evid. 602.
24
25   Massoud argues that every time a declarant said "I
26  understand that . . ." or something similar, the
27  declarant lacked personal knowledge, citing a "Practice
28

7

Pointer" in <u>Federal Civil Procedure Before Trial</u>.
Moreover, Massoud objects on the basis of lack of
personal knowledge when a declarant spoke about County
policy generally, for example, Luna Decl. ¶ 7, 13,
Harrison Decl. ¶¶ 26, 32, and Neal Decl. ¶ 42.

As the County correctly points out, however, when a
declarant has first-hand knowledge of facts, including
employer policies, practices, and activities, personal
knowledge may be inferred.  See <u>Barthelemy v. Air Lines</u>
<u>Pilots Ass'n</u>, 897 F.2d 999, 1018 (9th Cir. 1990)
(personal knowledge can be shown by "the nature of the
declarant's position and nature of participation in
matter.").  Those objections are OVERRULED.

**B.  Defendants' Objections**

Defendants object on numerous grounds to the
declaration Richard Kos, Plaintiffs' expert regarding
municipal planning, in its entirety.  (<u>See</u> Defs' Objs.
#1.)  Additionally, Defendants object to entire
paragraphs of Kos's declaration, individual sentences
within those paragraphs, and phrases within those
sentences.  (<u>Id.</u> at #2-18.)

The Court has read and considered Kos's declaration,
and finds it is inadmissible for two reasons.  First, the
declaration is conclusory, and does not have sufficient

factual underpinnings.  Though Kos's opinion is based
exclusively on his experience as a city planner, his
expert opinion does not explain if, and to what extent,
the Defendants' actions deviated from acceptable planning
norms or procedures.  An expert who relies solely or
primarily on his experience "must explain how that
experience leads to the conclusions reached, why that
experience is a sufficient basis for the opinion, and how
that experience is reliably applied to the facts."  Fed.
R. Evid. 702 advisory committee's note (2000) (emphases
added); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136,
146 (1997) (explaining that expert opinions cannot be
"connected to existing data only by the *ipse dixit* of the
expert").

    Second, to the extent that Kos's declaration is
supported, it is inadmissible because it is rife with
legal opinion regarding whether the County's actions were
discriminatory.  See G. v. Hawaii, Dep't of Human Servs.,
703 F. Supp. 2d 1112, 1128 (D. Haw. 2010) ("Expert's
[sic] may not offer opinions on a purely legal issue or
the application of legal standards to the evidence"
(citing Aquilar v. Int'l Longshoremen's Union Local # 10,
966 F.2d 443, 447 (9th Cir. 1992))).

    Defendants also object to the declaration of Steven
Hoslett in its entirety, on the basis that his opinion is

not based on admissible evidence, and his opinions are speculative and lack a factual basis.  (See Defs' Objs. 20.)  The Court OVERRULES this objection.  Defendants have pointed to no specific evidence that is inadmissible, nor given any reason why Hoslett's opinions are speculative.

### III. FACTS

To the extent certain facts, or conclusions, are not mentioned in this Order, the Court has not relied on them in reaching its decision.  In addition to considering the evidentiary objections raised by the parties, the Court has independently considered the admissibility of the evidence underlying Defendants' UMF and Plaintiffs' UMF and has not considered facts that are irrelevant or based upon inadmissible evidence.  The following material facts are supported adequately by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purposes of this Motion.  See L.R. 56-3.

### A.  Massoud's Initial Attempt to Obtain a CUP

Riverside County requires business owners to obtain a "conditional use permit" ("CUP") in order to operate certain types of business within the county limits.[4]  In

---

[4]     The relevant County zoning rules are contained in County Ordinance 348.

10

Fall 2007, Massoud met with representatives of the County's Planning Department to inquire about opening a "Class IV pet kennel" in the Dos Lagos area of unincorporated Riverside County.  (Plfs' UMF 65.) Massoud was told that County zoning for that area required a CUP to operate a kennel; he was also told that it would take approximately one year for the CUP process to be completed and would cost approximately $30,000. (Plfs' UMF 66-67.)  Further, Massoud was told that there was no guarantee that a CUP would be granted; rather, he was told that a CUP probably would not be granted. (Plfs' UMF 68.)  Based on these representations by County employees, Massoud decided against opening a kennel in the Dos Lagos area.  (Plfs' UMF 121, 124.)  He opened a kennel in Corona, California, instead.  (Plfs' UMF 124.)

**B.  Amber's Opens a Kennel in Dos Lagos**

Unbeknownst to Massoud, in 2010, the County allowed Amber and Jeff Lewin, who are both Caucasian, to open a pet kennel on Pulsar Court in the Dos Lagos area without a CUP.[5]  (See Plfs' UMF 69-82.)

Principal Planner Scott O. Arnold ("Arnold") was responsible for allowing Amber's to operate at the Pulsar

---

[5]  The Lewins are the owners of the following businesses: Amber's Mobile Pet Salons, Inc., Amber's Mobile Pet Grooming, LLC, and Amber's Luxury Pet Hotel (collectively, "Amber's").  This action initially named these businesses as defendants, but later dismissed them.

Court location without a CUP.[6]  (Plfs' UMF 83; Defs' UMF 7.)  In fact, Arnold provided Amber's with a letter on County letterhead, which stated that the Amber's Pulsar Court location did not need a CUP to operate.[7]  (Plfs' UMF 83; Defs' UMF 36.)  Massoud views Amber's as a competitor.  (Plfs' UMF 69.)  It is undisputed that Ordinance 348 requires a business to obtain a CUP in order to operate a kennel in the Dos Lagos area.

**C.   Massoud Inquires about a CUP a Second Time**

Massoud returned to the County's Building and Planning Department on October 1, 2012, in order to determine if the Dos Lagos area had been re-zoned since he last inquired about opening a kennel.[8]  (Defs' UMF 17; Plfs' UMF 85.)  While there, Massoud was told by the desk clerk that Amber's was operating in the Dos Lagos area without a CUP.  (Defs' UMF 17; Plfs' UMF 86.)  When Massoud asked for additional information, he was directed to speak with County Planner Larry Ross ("Ross").  (Plfs' UMF 87-88.)

---

[6]  Ross states that he was unaware that Arnold did this.  (Defs' UMF 11.)  Arnold is now deceased and was not deposed or named as a defendant in this case.

[7]  Though the letter does not explicitly state that Amber's may operate its business without a CUP, the parties appear to agree this is the import of the letter.

[8]  By this time, Massoud had opened a kennel in Corona, California.  (Plfs' UMF 124.)

Ross told Massoud that he was unsure why Amber's was operating without a CUP, and said he would research the matter further.[9]   (Plfs' UMF 90.)   Before Massoud left, Ross gave him an Application Fee Schedule and Application for Land Use, which stated that the minimum cost for a CUP for a kennel in the Dos Lagos area was $15,000 to $30,000.  (Plfs' UMF 90-91.)

Ross's research revealed that Amber's had been operating without a CUP, contrary to County Ordinance 348.  (Defs' UMF 20.)  Upon learning this, Ross spoke with his supervisor, Frank L. Coyle ("Coyle"), to determine the correct course of action.  (Defs' UMF 21.) Ross's position was that Arnold's decision to allow Amber's to operate without a CUP was in error, and could not be allowed in the future.  (Id.)  Coyle agreed. (Id.)

Later that day, Ross telephoned Massoud and told him that Amber's had been allowed to operate without a CUP, but when Massoud asked to be given the same treatment, Ross declined to do so.  (Defs' UMF 24-26; Plfs' UMF 92-

---

[9]   The Court has not considered Massoud's statement that, before he spoke with Ross, an unnamed County employee told him that the Building and Safety Department "had received a direct order from Mr. Ross to put the building plans for [his] competitor . . . through and get them approved without a CUP" in 2010.  (Plfs' UMF 89; Massoud Decl. ¶ 9.)  This is double hearsay, not falling within an exception to the rule barring such evidence.

94.)  Ross did not tell Massoud that if he applied for a CUP his application would be denied automatically. (Defs' UMF 27.)  After this conversation, Ross and Massoud never spoke again.  (Defs' UMF 28.)  Massoud did not submit the CUP application he inquired about in October 2012.  (Defs' UMF 29.)

**D.  County Planning Policies**

The County's Planning Department takes the lead in assessing most land development proposals.  (Defs' UMF 48.)  According to Ross, when a person inquires about a CUP, the general practice is to tell him or her about the range of fees and that the application process can take six months to one year.  (Defs' UMF 30-32.)  County Planning Department employees do not have the authority to deny a CUP, only the Planning Commission or the Board of Supervisors has that power.  (Defs' UMF 34.)

When CUP applications are submitted, they are transmitted to numerous County Departments and outside agencies for review.  (Defs' UMF 47.)  Re-designs may be required before a CUP is approved; thereafter, the application is submitted for public hearing.  (Defs' UMF 47.)  Given that numerous agencies and departments may be involved in the approval of a CUP, the time for processing can vary, though the Planning Department may choose to expedite certain applications.  (Defs' UMF 49.)

There is no state law, County policy or County ordinance
that prohibits expediting a CUP application. (Defs' UMF
46.)

Neither before or since the one instance when Arnold
issued a letter stating that Amber's could operate
without a CUP has the County's planning department
allowed a business to forego the CUP process. (Defs' UMF
12.) According to the Defendants, the County Planning
Department has never had a policy of discriminating
against a person or application based on any protected
class; rather, the County has a zero tolerance policy
regarding discrimination. (Defs' UMF 60, 62.)

**E.   Massoud's Code Enforcement Complaint Against
      Amber's and the County's Decision Not to Take
      Action**

In October 2012, Massoud filed a complaint with the
County regarding its decision to allow Amber's to operate
without a CUP, alleging that the County discriminated
against him because he was of Lebanese descent. (Defs'
UMF 35; Plfs' UMF 96.) When County Code Enforcement
officers went to Amber's to investigate the complaint,
representatives from Amber's produced Arnold's letter.
(Defs' UMF 36; Plfs' UMF 96-99.) In response, the
officers left the scene, noting in their report that they
would follow-up with the owners in a few days. (Plfs'

UMF 100.)  No follow-up was undertaken, however; the
enforcement complaint was terminated without resolution.
(Plfs' UMF 103-04.)  This is consistent with Ross's and
the County's position that Amber's could not be required
to obtain a CUP without exposing itself to litigation
because Amber's had Arnold's letter.  (Defs' UMF 36-39.)

**F.   Amber's Seeks and Is Granted a CUP on an Expedited**
**     Basis**

In 2013, Amber's decided to relocate its business to
an adjacent location on Pulsar Court; this new location
was zoned for the same use as its previous location and
required a CUP to operate.  (Defs' UMF 40.)  Amber's
submitted an application for a CUP on an expedited basis,
and was required to pay only $6,000.[10]  (Defs' UMF 42-46;
Plfs' UMF 105.)  The application was given to Urban and
Regional Planner IV Tamara Harrison ("Harrison") for
consideration because other planners had a high workload
and because she was highly experienced.  (Defs' UMF 41-
42.)  Ross had no involvement with this application.
(Defs' UMF 43.)

Amber's CUP application was expedited because the
holidays were fast-approaching, and because there were
limited opportunities for the Planning Commission

---

[10]   According to Ross, the County does allow CUP
applicants to negotiate an initial deposit on the
application.  (Defs' UMF 33.)

hearings to take place.  (Defs' UMF 44-45.)  According to
Harrison, Robert Magee from the First District
Supervisor's Office made an inquiry into Amber's CUP
application and thereafter acted as a liaison between
Amber's and the County.  (Defs' UMF 50-51.)  Magee never
encouraged Harrison to process the application
inappropriately or unlawfully.  (Defs' UMF 52.)

On November 5, 2013, Harrison prepared a staff report
regarding Amber's CUP application and requested a hearing
before the Planning Commission, which took place on
November 20, 2013.  (Defs' UMF 55-56.)  The public was
notified in advance of the Planning Commission hearing.
(Defs' UMF 56.)  At the November 20, 2013 hearing, the
Planning Commission voted to approve Amber's CUP; there
were no public objections.  (Defs' UMF 57.)

Amber's CUP was approved as of December 10, 2013.
(Defs' UMF 58.)  That same day, Harrison sent an
electronic mail message ("e-mail") to Magee, informing
him that the CUP had been approved, and that the time
period for appeal had begun that day.  (Plfs' UMF 115.)
Magee thanked Harrison for "making this happen both
quickly and economically."  (Plfs' UMF 115.)

1       Massoud contends that he would have sought a CUP had

2   he known that he could receive one on an expedited basis

3   at a reduced rate.  (Plfs' UMF 123.)

4

5                       **IV. LEGAL STANDARD**

6       A motion for summary judgment or summary adjudication

7   shall be granted when there is no genuine issue as to any

8   material fact and the moving party is entitled to

9   judgment as a matter of law.  Fed. R. Civ. P. 56(c);

10  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

11  (1986).  The moving party must show that "under the

12  governing law, there can be but one reasonable conclusion

13  as to the verdict."  Anderson, 477 U.S. at 250.

14

15      Generally, the burden is on the moving party to

16  demonstrate that it is entitled to summary judgment.

17  Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998);

18  Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707

19  F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears

20  the initial burden of identifying the elements of the

21  claim or defense and evidence that it believes

22  demonstrates the absence of an issue of material fact.

23  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

24

25      Where the non-moving party has the burden at trial,

26  however, the moving party need not produce evidence

27  negating or disproving every essential element of the

28

1  non-moving party's case.  Celotex, 477 U.S. at 325.

2  Instead, the moving party's burden is met by pointing out

3  that there is an absence of evidence supporting the non-

4  moving party's case.  Id.

5

6     The burden then shifts to the non-moving party to

7  show that there is a genuine issue of material fact that

8  must be resolved at trial.  Fed. R. Civ. P. 56(e);

9  Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256.  The

10 non-moving party must make an affirmative showing on all

11 matters placed in issue by the motion as to which it has

12 the burden of proof at trial.  Celotex, 477 U.S. at 322;

13 Anderson, 477 U.S. at 252.  See also William W.

14 Schwarzer, A. Wallace Tashima & James M. Wagstaffe,

15 Federal Civil Procedure Before Trial § 14:144.  "This

16 burden is not a light one.  The non-moving party must

17 show more than the mere existence of a scintilla of

18 evidence."  In re Oracle Corp. Securities Litigation, 627

19 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S.

20 at 252).

21

22    A genuine issue of material fact will exist "if the

23 evidence is such that a reasonable jury could return a

24 verdict for the non-moving party."  Anderson, 477 U.S. at

25 248.  In ruling on a motion for summary judgment, a court

26 construes the evidence in the light most favorable to the

27 non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135

28

1  (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec.

2  Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

3

4                        **V. DISCUSSION**

5  **A.   Massoud Has Standing**

6       Defendants first argue that Massoud lacks standing to

7  bring this action because: (1) his alleged damages are

8  speculative and (2) he failed to submit a request for a

9  CUP, and thus was not personally denied equal treatment

10 giving rise to a cognizable injury.  (MSJ at 5-7.)

11

12      "Article III, § 2 of the Constitution states that the

13 federal courts may only adjudicate 'cases' and

14 'controversies,' and thus imposes what the Supreme Court

15 has called 'the irreducible constitutional minimum of

16 standing.'"  Cent. Delta Water Agency v. United States,

17 306 F.3d 938, 946 (9th Cir. 2002) (quoting Lujan v.

18 Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "The

19 requirement of standing 'tends to assure that the legal

20 questions presented to the court will be resolved, not in

21 the rarified atmosphere of a debating society, but in a

22 concrete factual context conducive to a realistic

23 appreciation of the consequences of judicial action.'"

24 Id. (quoting Valley Forge Christian College v. Americans

25 United for Separation of Church & State, 454 U.S. 464,

26 472 (1982).

27

28

1      It is the plaintiff's burden to establish the three
2  elements of standing to assert federal jurisdiction.  <u>Id.</u>
3  at 947.  In order to have standing, a plaintiff must show
4  "(1) an 'injury in fact' that is 'concrete and
5  particularized' and 'actual or imminent,' not
6  'conjectural or hypothetical'; (2) a 'causal connection
7  between the injury' and the challenged action of the
8  defendant; and (3) that it is 'likely, as opposed to
9  merely speculative, that the injury will be redressed by
10  a favorable decision.'"  <u>Multistar Indus., Inc. v. U.S.</u>
11  <u>Dep't of Transp.</u>, 707 F.3d 1045, 1054 (9th Cir. 2013)
12  (quoting <u>Lujan</u>, 504 U.S. at 560-61).

13

14     **1.   Massoud's Damages Are Not Speculative**

15     Defendants argue that, to the extent Massoud claims
16  he was damaged by the County's failure to allow him to
17  open a business without a CUP, but then allowed a
18  competing business to open in the same location without a
19  CUP, his damages are too speculative to be recoverable.
20  (MSJ at 6.)

21

22     Here, Massoud contends that he initially sought to
23  open his business in the Dos Lagos area, but was
24  dissuaded because of the expensive and time-consuming CUP
25  application process.  He then opened his business in what
26  he considered to be a commercially inferior location in
27  Corona.  Given that Amber's was allowed to open and

28

1   operate for a number of years without a CUP in the same
2   location that Massoud wished to open his business, his
3   damages are not speculative.

4

5       Section 1983 "was intended to create 'a species of
6   tort liability' in favor of persons deprived of federally
7   secured rights." <u>Smith v. Wade</u>, 461 U.S. 30, 34 (1983).
8   "The purpose of awarding damages in a section 1983 action
9   is to compensate the aggrieved party." <u>Chalmers v. City</u>
10  <u>of Los Angeles</u>, 762 F.2d 753, 760 (9th Cir. 1985) (citing
11  <u>Carey v. Piphus</u>, 435 U.S. 247, 254-55 (1978)).
12  "Compensatory damages for deprivation of a federal right
13  are governed by federal standards, as provided by
14  Congress in 42 U.S.C. § 1988 . . . .  [A]s we read § 1988
15  . . . both federal and state rules on damages may be
16  utilized, whichever better serves the policies expressed
17  in the federal statutes." <u>Sullivan v. Little Hunting</u>
18  <u>Park, Inc.</u>, 396 U.S. 229, 240 (1969); <u>see also</u> <u>Chalmers</u>,
19  762 F.2d at 760-61 (affirming award of damages for lost
20  profits in connection with a § 1983 action alleging due
21  process violation).

22

23      When an established business is "prevented or
24  interrupted" by a tort, damages for the loss of future
25  profits is recoverable. <u>Grupe v. Glick</u>, 26 Cal. 2d 680,
26  692 (1945).  Future profits are recoverable for an
27  established business because they "may be ascertained
28

with reasonable certainty from the past volume of
business and other provable data relevant to the probable
future sales." <u>Id.</u>  On the other hand, where an
unestablished business is "prevented or interrupted,"
those prospective profits are not recoverable because
"their occurrence is uncertain, contingent, and
speculative," unless "there has been operating experience
sufficient to permit a reasonable estimate of probable
income and expense." <u>Id.</u> at 693; <u>Kids' Universe v.
In2Labs</u>, 95 Cal. App. 4th 870, 883 (2002).  "Lost
anticipated profits cannot be recovered if it is
uncertain whether any profit would have been derived at
all from the proposed undertaking." <u>Kids' Universe</u>, 95
Cal. App. 4th at 883.

     A plaintiff may recover damages if he can
"demonstrate a reasonable probability that profits would
have been earned except for the defendant's conduct."
<u>Id.</u> (citation omitted).  Damages may be proven through
"expert testimony, economic and financial data, market
surveys and analyses, business records of similar
enterprises, and the like." <u>Id.</u> at 884 (citation
omitted).  Lost profits need not be established with
mathematical certainty or precision. <u>Lewis Jorge Const.
Management, Inc., Pomona Unified Sch. Dist.</u>, 34 Cal. 4th
960, 975 (2004). Overall, "the loss of prospective
profits are recoverable where the evidence makes

reasonably certain their occurrence and extent."  <u>Grupe</u>,
26 Cal. 2d at 693; <u>Kids' Universe</u>, 95 Cal. App. 4th at
883.

    Here, while Massoud did not establish a business in
the Dos Lagos area, it is undisputed that he did
establish a business in the nearby area of Corona.
Moreover, because Amber's did establish a business in Dos
Lagos, Massoud could compare the profits of the business
that he did establish with the business that he wished to
establish.  Massoud has submitted expert testimony in
this regard.  (<u>See generally</u>, Hoslett Decl.)  The Court
finds this is sufficient to show he has an injury in fact
that is not speculative.

    **2.   Massoud's Failure to Apply for a CUP Does Not
         Deprive Him of Standing**

    Defendants also argue that because Massoud did not
apply for a CUP once Ross told him that he would be
required to do so in order to operate a kennel in the Dos
Lagos area, he cannot show causation in order to
establish standing.  (MSJ at 7-8.)

    Defendants cite <u>Perfino v. California Dep't of
Alcoholic Beverage Control</u>, 458 F. App'x 699 (9th Cir.
2011).  There, the appellants received advice from a
field official from the Department of Alcoholic Beverage

1  Control ("ABC").  Id. at 699-700.  Based on that advice,

2  appellants' business partner scuttled their partnership.

3  Id.  Appellants later determined that the advice was

4  incorrect, and brought suit against the ABC on equal

5  protection grounds.  Id. at 700.  The Ninth Circuit

6  affirmed the district court's entry of summary judgment

7  in favor of ABC, because appellants' damages were caused

8  by their business partner dissolving their partnership,

9  not any definitive action by the ABC.  Id.

10

11      Here, however, Massoud's alleged damages could, if

12  proven, be characterized fairly as being caused by the

13  County.  He was told initially he would need to apply for

14  a CUP, and then a competing business opened without a

15  CUP.  Massoud's lost profits, as discussed above,

16  therefore would be proximately caused by the County's

17  actions, if his allegations were proven.

18

19      Accordingly, the Court DENIES the MSJ to the extent

20  it is brought on lack of standing.

21

22  **B.  Massoud's Monell Claim Fails**

23      Massoud's second claim alleges that the County

24  "maintained policies and practices of discriminating

25  against persons of Arabic ethnicity and/or Plaintiffs as

26  a class of one" by: (1) the knowing and intentional

27  disclosure of false and misleading information to persons

28

of Arabic ethnicity; (2) selective enforcement of County
zoning laws discriminating against persons of Arabic
ethnicity and in favor of persons of Caucasian ethnicity;
(3) conspiring with persons of Caucasian ethnicity in
order to advantage their businesses at the expense of
persons of Arabic ethnicity; and (4) providing no
rational basis for this discrimination or disparate
treatment.  (<u>See</u> SAC ¶ 113.)  This claim is alleged
against the County only.

    In <u>Monell</u>, the Supreme Court held that "a
municipality can be found liable under § 1983 only where
the municipality *itself* causes the constitutional
violation at issue.  *Respondeat superior* or vicarious
liability will not attach under § 1983."  <u>City of Canton,
Ohio v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Monell</u>, 436
U.S. at 690-91 (municipality cannot be held liable under
§ 1983 "solely because it employs a tortfeasor").  Stated
differently, a municipal government entity may only be
liable under § 1983 "when execution of a government's
policy or custom, whether made by its lawmakers or by
those whose edicts or acts may fairly be said to
represent official policy, inflicts the injury"
complained of.  <u>Monell</u>, 436 U.S. at 694.

    A section 1983 plaintiff may establish municipal
    liability in one of three ways.  First, the

1    plaintiff may prove that a city employee

2    committed the alleged constitutional violation

3    pursuant to a formal governmental policy or a

4    "longstanding practice or custom which

5    constitutes the 'standard operating procedure'

6    of the local governmental entity."  Second, the

7    plaintiff may establish that the individual who

8    committed the constitutional tort was an

9    official with "final policy-making authority"

10   and that the challenged action itself thus

11   constituted an act of official governmental

12   policy. . . .  Third, the plaintiff may prove

13   that an official with final policy-making

14   authority ratified a subordinate's

15   unconstitutional decision or action and the

16   basis for it.

17

18   Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir.

19   1992) (internal citations omitted).

20

21       In order to succeed on a Monell claim against a

22   municipality, a plaintiff must "demonstrate that the

23   defendant's conduct was the actionable cause of the

24   claimed injury," by establishing "both causation-in-fact

25   and proximate causation."  Harper v. City of Los Angeles,

26   533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations

27   and citations omitted).  In other words, a plaintiff must

28

establish that "the entity's policies evince a
'deliberate indifference' to the constitutional right and
are the 'moving force behind the constitutional
violation.'"  Edgerly v. City & Cnty. of San Francisco,
599 F.3d 946, 960 (9th Cir. 2010).

Massoud's Opposition argues that the County is liable
on either the first or the third Monell theory explained
above.  (Opp'n at 15.)

### 1.  Massoud's Evidence of a Persistent and Widespread Policy of Discrimination Is Insufficient

Monell liability can attach to a municipality where
"the municipality itself causes the constitutional
violation through 'execution of a government's policy or
custom, whether made by its lawmakers or by those whose
edicts or acts may fairly be said to represent official
policy.'"  Menotti v. City of Seattle, 409 F.3d 1113,
1147 (9th Cir. 2005) (citation omitted).

"A municipal 'policy' exists when 'a deliberate
choice to follow a course of action is made from among
various alternatives by the official or officials
responsible for establishing final policy with respect to
the subject matter in question.'"  Id. (citing Pembaur v.
City of Cincinnati, 475 U.S. 469, 483 (1986).  Such a

1  policy may be "explicitly adopted" or "tacitly
2  authorized."  Gibson v. United States, 781 F.2d 1334,
3  1337 (9th Cir. 1986) (citing Monell, 436 U.S. at 690-91).
4
5       Only a "longstanding practice or custom which
6  constitutes the 'standard operating procedure' of the
7  local government entity," is sufficient to impose
8  liability for an unconstitutional custom.  Menotti, 409
9  F.3d at 1151.  Such a practice "must be so 'persistent
10  and widespread' that it constitutes a permanent and well
11  settled city policy.'"  Trevino v. Gates, 99 F.3d 911,
12  918 (9th Cir. 1996) (quoting Monell, 436 U.S. at 691).
13  "[A] custom or practice can be 'inferred from widespread
14  practices or "evidence of repeated constitutional
15  violations for which the errant municipal officers were
16  not discharged or reprimanded."'"  Hunter v. Cnty. of
17  Sacramento, 652 F.3d 1225, 1233 (9th Cir. 2011)
18  (citations omitted).
19
20       "Liability for improper custom may not be predicated
21  on isolated or sporadic incidents; it must be founded
22  upon practices of sufficient duration, frequency and
23  consistency that the conduct has become a traditional
24  method of carrying out policy."  Id. (citations omitted);
25  Avalos v. Baca, 596 F.3d 583, 588 (9th Cir.
26  2010)("[p]roof of a single incident of unconstitutional
27  activity is not sufficient to impose liability under
28

Monell, unless proof of the incident includes proof that
it was caused by an existing, unconstitutional municipal
policy, which policy can be attributed to a municipal
policy maker." (quoting Oklahoma City v. Tuttle, 471 U.S.
808, 823-24 (1985) (alteration in original)).

Massoud offers very little in the way of substantive
argument on his Monell claim.  He points to the following
evidence: (1) Arnold allowed Amber's to operate without a
CUP in 2010; (2) when Massoud brought this to Ross's
attention, both Ross and Coyle (a) decided nothing could
be done because Amber's had Arnold's letter and (b)
declined to allow two wrongs to make a right by allowing
Massoud to operate a business without a CUP; (3) Ross
terminated Massoud's code enforcement complaint without
resolution; and (4) the County allowed Amber's to apply
for and receive a CUP on a low-cost and expedited basis.
(Opp'n at 15-16.)

As Defendants argue, even assuming that there was
some modicum of discriminatory intent behind Arnold's
decision to allow Amber's to operate without a CUP and
give it a letter saying as much — which is now almost
impossible to know as Arnold is deceased — none of the
remaining evidence shows a practice of "sufficient
duration, frequency and consistency that the conduct has

become a traditional method of carrying out policy."[11]
(MSJ at 12-14.)  Moreover, Ross's and Coyle's decision
not to enforce the CUP requirements against Amber's for
fear of litigation (and terminating Code Enforcement
proceedings for that reason) does not demonstrate a
policy of discrimination.

Instead, the evidence shows that, although Amber's
should not have been allowed to operate without a CUP, it
was required to obtain one when it moved.  Though Massoud
contends allowing Amber's to apply for and receive a CUP
on an expedited basis and at a lower cost was a "sham,"
the undisputed facts show that allowing applicants to
have their CUP application expedited did not violate
County policy or law.

> **2.  Massoud Has Not Shown that Any of the**
>     **Individual Defendants Had "Final Policy-Making**
>     **Authority"**

Massoud's Opposition argues that the "evidence also
creates a triable issue of material fact . . . that 'the
tortfeasor was an official whose acts fairly represent
official policy such that the challenged act constituted

---

[11]   Nor has Massoud shown any genuine dispute with
respect to a theory that the County failed to discipline
or punish Arnold.  It is unclear when Arnold died, but it
appears he was no longer working for the County at the
time Ross told Massoud that Amber's was operating without
a CUP; at that point, there was no one to discipline or
reprimand.

an official policy[.]'"   (Opp'n at 15.)   The Opposition
cites cases dealing with individual supervisory liability
to support this argument, however, not liability based on
official policy.   (See id. at 16.)   For example, Massoud
cites Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001)
for the proposition that a "supervisor may be
individually liable under § 1983 'if there exists either
(1) his or her personal involvement in the constitutional
deprivation, or (2) a sufficient causal connection
between the supervisor's wrongful conduct and the
constitutional violation.'"   (Opp'n at 16.)   But Jeffers
dealt with a supervisor's vicarious liability under
§ 1983, not with the quantum of evidence required to
sustain a theory that a municipal entity could be liable
on a Monell theory for a supervisor's actions.   (See
Jeffers, 267 F.3d at 915-16 (not mentioning Monell
liability).)   Similarly, Massoud's citations to Menotti,
409 F.3d at 1149 ("supervisory liability is imposed
against a supervisory official in his individual capacity
. . ."), and Larez v. City of Los Angeles, 946 F.2d 630,
646 (9th Cir. 1991) ("The district court correctly
instructed the jury that it could find Chief Gates liable
in his individual capacity if he 'set[ ] in motion a
series of acts by others, or knowingly refused to
terminate a series of acts by others, which he kn[e]w or
reasonably should [have] know[n], would cause others to
inflict the constitutional injury.'"), all concern

32

1  *individual* capacity liability, not municipal liability
2  under Monell.  As Massoud has not pointed to any official
3  with final policy-making authority who committed any
4  constitutional tort against him, there is no genuine
5  dispute as to this claim.

6

7      In sum, Massoud has failed to raise a genuine issue
8  of material fact as to his Monell claim.  He has not
9  shown that there is a longstanding County policy or
10  custom of favoring Caucasian business owners or of
11  disfavoring Lebanese or Arab business owners.  Moreover,
12  he has not pointed to any official with official policy-
13  making authority who committed a constitutional tort
14  against him that can give rise to Monell liability.
15  Accordingly, the Court GRANTS the MSJ as to this claim.
16

17 **C.  Massoud's § 1983 Claim Against the Individual**
18 **    Defendants**
19      Massoud's first claim alleges that the County and the
20  individual defendants "intentionally discriminated
21  against Plaintiffs in or about October, 2012, by
22  conveying false and erroneous information concerning [the
23  County's] actual policies and procedures concerning the
24  required CUP permitting procedures . . . and refusing to
25  apply and administer the same flexible and relaxed
26  policies and procedures for Caucasian CUP applicants
27  . . . whereas Plaintiffs and other applicants of Arab-
28

1  American ethnicity . . . were required to demonstrate
2  full and rigid compliance with all formal, published CUP
3  permitting process[es] . . . ."[12]  (SAC ¶ 99.)  Thus,
4  Massoud avers that "[i]n engaging in the foregoing
5  intentional acts of discrimination as against Plaintiffs
6  . . . solely on the basis of Plaintiffs' Arabic
7  ethnicity, [the individual defendants] . . . have denied
8  Plaintiffs 'the full and equal benefits of all laws and
9  proceedings for the security of persons and property as
10 is enjoyed by white citizens' guaranteed under 42
11 U.S.C.A. 1981(a), and the 14th Amendment of the
12 Constitution of the United States."  (Id. ¶ 101.)

13

14     **1.    Summary Judgment Must Be Entered in Favor of**
15          **Gregory A. Neal, Carolyn Syms Luna, and Juan**
16          **Perez**

17     Before the Court discusses the merits of the MSJ as
18 to Massoud's equal protection claim, it first must
19 address the state of the evidence as to the individual
20 defendants.  As noted above, the individual defendants
21 named in this suit are Ross, Coyle, Gregory A. Neal,

22 _____

23     [12]   As noted above, the County may only be liable
   under § 1983 on a Monell theory of liability; thus, to
24 the extent Massoud alleges the County of Riverside
   violated his equal protection rights, the Court enters
25 judgment in favor of the County as to this claim.  See
   Gerhart v. Lake Cnty., Mont., 637 F.3d 1013, 1019 (9th
26 Cir. 2011) (hereinafter "Gerhart")(granting a county's
   motion for summary judgment on equal protection and due
27 process claims arising from alleged zoning discrimination
   where the plaintiff failed to allege a Monell claim
28 successfully).

Carolyn Syms Luna, and Juan Perez; all of these defendants, with the exception of Ross, were named for the first time in the SAC.  The SAC alleges one claim against each of them: violation of Massoud's equal protection rights in violation of 42 U.S.C. § 1983.

In the recitation of undisputed facts above, Neal, Perez, and Luna are not mentioned, and Coyle is only mentioned once.  Below are summaries of Massoud's factual allegations against each, drawn from his own "Statement Opposing Genuine Issues in Dispute on Motion of Defendants for Summary Judgment" and the Opposition.

### a.  Gregory A. Neal

Neal never made available to Massoud the "quick[] and economic[]" CUP that Amber's received in 2013.  (Plfs' UMF 116.)  There is no allegation that Massoud had any contact with Neal, or that Neal had any role in Arnold's decision that Amber's did not require a CUP in 2010, or Amber's subsequent CUP application and approval in 2013.

### b.  Juan Perez

Perez was a participant in the e-mail chain in which Magee thanked Harrison for helping Amber's obtain the "quick[] and economic[]" CUP in 2013.  (Opp'n at 11; Plfs' UMF 115.)  Magee CC'ed Perez on this e-mail, to which Perez replied: "Thank you Tamara [Harrison] for

1   your good work, and Bob [Magee] for the acknowledgment."
2   (Elias Decl. Ex. 5 (attaching Ex. 39, Bates No. C-011280-
3   81).)   Perez never made available to Massoud the "quick[]
4   and economic[]" CUP that Amber's received in 2013.
5   (Plfs' UMF 116.)   The Opposition also asserts that Perez
6   was "involved in the review and sham, pre-approved
7   'expedited' CUP process afforded to Amber[']s," though it
8   cites no evidence for this assertion.   There is no
9   allegation that Massoud had any contact Perez or that
10  Perez even knew of Massoud.

11

12          **c.   Carolyn Syms Luna**
13      Luna never made available to Massoud the "quick[] and
14  economic[]" CUP that Amber's received in 2013.   (Plfs'
15  UMF 116.)   The Opposition also asserts that Luna was
16  "involved in the review and sham, pre-approved
17  'expedited' CUP process afforded to Amber[']s," though it
18  cites no evidence for this assertion.   (See Opp'n at 2.)
19  The Opposition also states that "Luna and Ross both admit
20  they did not enforce the CUP requirement as to Ambers."
21  (Id. at 16 (citing Plfs' UMF 102-14).)   Those portions of
22  the Statement of Genuine Issues do not mention Luna,
23  however.   And, in any case, neither the Statement of
24  Genuine Issues nor the Opposition mention any specific
25  actions Luna took with respect to Amber's.   Moreover,
26  there is no allegation that Massoud had any contact Luna
27  or that Luna even knew of Massoud.

28

1

### d.   Frank L. Coyle

2    Coyle never made available to Massoud the "quick[]

3 and economic[]" CUP that Amber's received in 2013.

4 (Plfs' UMF 116.)  Coyle was "involved in the review and

5 sham, pre-approved 'expedited' CUP process afforded to

6 Ambers," though the Opposition cites no evidence for this

7 assertion.  (See Opp'n at 2.)  As Ross's supervisor,

8 Coyle conferred with him and agreed with his

9 determination that the County would not allow Massoud to

10 operate a kennel in the Dos Lagos area without a CUP,

11 despite the fact that Arnold had erroneously allowed

12 Amber's to operate in that area without a CUP.  (Id. at

13 9.)  There is no evidence that Coyle contacted Massoud

14 personally, or that he knew Massoud was of Lebanese

15 descent.

16

17

### e.   Larry Ross

18    Ross briefly spoke in person with Massoud about

19 Amber's being allowed to operate without a CUP on October

20 1, 2012.  (Plfs' UMF 87-88, 90, 92.)  In a telephone call

21 later that day, Ross stated that although Arnold allowed

22 Amber's to operate without a CUP, a CUP was still

23 required to operate in the Dos Lagos area, and Massoud

24 would not be exempted.  (Plfs' UMF 93-94.)  Ross told

25 Massoud that a CUP would cost somewhere between $15,000

26 to $30,000 and it could take up to one year before it was

27 approved.  (Plfs' UMF 94-95.)  Though Massoud initiated a

28

Code Enforcement complaint against Amber's, Ross, as the liaison between the Code Enforcement Officers and the Planning Department, terminated the complaint without resolution; Ross's rationale was that the County could not revoke Arnold's letter without exposing itself to liability.  (Plfs' UMF 100-101.)  Ross never spoke to Massoud again after the telephone call.  (Defs' UMF 28.)

Defendants contend "[a]t no time has [sic] Plaintiffs ever outlined in their SAC exactly what [Neal, Perez, Luna, and Coyle] did or did not do that violated Plaintiffs' constitutional rights," and that the "absence of any specific allegations against them should entitle them to summary judgment."  (MSJ at 15.)  Massoud does not address this argument in his Opposition.

Defendants are correct, to an extent.  "Liability under section 1983 arises only upon a showing of personal participation by the defendant.  A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (internal citation omitted); see also James v. Rowlands, 606 F.3d 646, 653 n.3 (9th Cir. 2010) ("Of course, § 1983 imposes liability on a defendant only

if he or she personally participated in or directed a
violation.").

Alternatively, even where personal participation is
absent, liability under § 1983 can be established "not
only by some kind of direct personal participation in the
deprivation, but also by setting in motion a series of
acts by others which the actor knows or reasonably should
know would cause others to inflict the constitutional
injury." Dahlia v. Rodriguez, 735 F.3d 1060, 1078 n.22
(9th Cir. 2013) cert. denied sub nom. City of Burbank,
Cal. v. Dahlia, 134 S. Ct. 1283 (2014) (quoting Gilbrook
v. City of Westminster, 177 F.3d 839, 854 (9th Cir.
1999)); Lacey v. Maricopa Cnty., 693 F.3d 896, 915 (9th
Cir. 2012) (quoting Johnson v. Duffy, 588 F.2d 740,
743-44 (9th Cir. 1978).

In either case, culpability "is limited not only by
the causal connection of the official to the
complained-of violation, but also by his intent
(depending on the underlying constitutional violation at
issue) to deprive another of that person's
rights . . . ." Lacey, 693 F.3d at 916.

At least with respect to Neal, Perez, and Luna,
Massoud has failed to adduce any evidence that these
defendants personally participated in any violation of

his rights, nor has he shown that these defendants set in motion a series of events they knew or should have known would violate his rights. Massoud also has not shown that any of these defendants intended to deprive Massoud of his rights.[13]

> Although the burden on a party moving for
> summary judgment is substantial, the burden on a
> party opposing a motion for summary judgment
> must not be underestimated. . . . [S]ummary
> judgment is the "put up or shut up" moment in a
> lawsuit, when the nonmoving party must show what
> evidence it has that would convince a trier of
> fact to accept its version of events.

Rush v. Denco Enterprises, Inc., 857 F. Supp. 2d 969, 974 (C.D. Cal. 2012) rev'd and remanded on other grounds, 593 F. App'x 727 (9th Cir. 2015). As Massoud has not

---

[13]   Massoud acknowledges this standard in his Opposition, arguing that "direct and circumstantial evidence proves triable issues exist as to whether Coyle, Luna, and Perez set into motion a series of acts by Harrison, Magee, Ross and others which led to the violation of Plaintiff's equal protection rights." (Opp'n at 17.)  First, this statement is contained in Massoud's discussion of Monell liability, as discussed above, not his discussion of the equal protection claim against the individual defendants.  Second, Neal is not mentioned as being involved in any series of acts to deprive Massoud of his rights.  Third, even if the Opposition included Neal in the list of persons who set in motion a series of acts by others allegedly to deprive Massoud of his rights, there is no evidence to support such a proposition, as discussed above.

provided any evidence that Neal, Perez, or Luna was involved, personally or otherwise, in any violation of his rights, summary judgment must be entered in their favor.  With respect to Ross, there is evidence that he had contact with Massoud concerning Amber's operation without a CUP.  Ross made the final decision that Massoud would be required to apply for a CUP before being allowed to operate a kennel in the Dos Lagos area; Coyle, Ross's supervisor, agreed with this decision.  As there is evidence that Ross had contact with Massoud, and that Coyle approved of one of Ross's decisions affecting Massoud, this is sufficient to proceed to the next level of analysis with respect to Ross and Coyle.

### 2.  "Class of One" Claims

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Sioux City Bridge Co. v. Dakota Cnty., Neb., 260 U.S. 441, 445 (1923) (internal citations and quotations omitted) ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination.").

1    Equal protection claims come in two types: a
2  plaintiff may allege he was intentionally discriminated
3  against based on his membership in a protected class, or
4  he may allege he was intentionally treated differently
5  from others similarly situated and there was no rational
6  basis for the difference in treatment, also known as a
7  "class of one" theory. Johannes v. Cnty. of Los Angeles,
8  563 F. App'x 567, 568 (9th Cir. 2014) (citing Serrano v.
9  Francis, 345 F.3d 1071, 1082 (9th Cir. 2003)
10  (requirements for claims based on membership in protected
11  class); Village of Willowbrook v. Olech, 528 U.S. 562,
12  564 (2000) (hereinafter ("Olech") (per curiam) (class of
13  one discrimination).
14
15    Defendants contend that Massoud does not allege he is
16  a member of a suspect class, and thus he can only proceed
17  on a "class of one" theory. (MSJ at 8.) Massoud does
18  not address this contention directly in his Opposition,
19  though he does argue that his principal theory of
20  liability is that defendants deprived him of his equal
21  protection rights "both by suspect classification based
22  on Massoud's Arabic ethnicity, as well as a 'class of
23  one.'" (Opp'n at 1.) The Opposition provides scant, if
24  any, argument on the issue of discrimination on the basis
25  of a suspect class. Indeed, the only other mention of
26  the Defendants denying Massoud's rights as a member of a
27  suspect class is a passing reference later in the
28

Opposition, stating that Defendants should have known
their actions would "inflict a violation of equal
protection on either the suspect class of ethnicity, or a
'class of one' for arbitrary enforcement."  (Opp'n at 17
(discussing <u>Monell</u> liability).)  As Massoud presents no
*argument* that he was intentionally discriminated against
based on his membership in a suspect class, the Court
only addresses his claim that he was discriminated
against as a "class of one."

"The Supreme Court has recognized that 'an equal
protection claim can in some circumstances be sustained
even if the plaintiff has not alleged class-based
discrimination, but instead claims that she has been
irrationally singled out as a so-called "class of one."'"
<u>Gerhart</u>, 637 F.3d at 1021 (citing <u>Engquist v. Or. Dep't
of Agric.</u>, 553 U.S. 591, 601 (2008) ("<u>Engquist</u>")).  In
order to succeed on such a claim here, Massoud must
demonstrate that the Defendants (1) intentionally, (2)
treated him differently than other similarly situated
persons, (3) without a rational basis.  <u>Gerhart</u>, 637 F.3d
at 1022 (citing <u>Olech</u>, 528 U.S. at 564).

With respect to the intent prong of the test, Massoud
need not show that the Defendants were motivated by
subjective ill will, only that they intended to treat him
differently from other applicants.  <u>Id.</u> ("Gerhart does

1  not need to demonstrate that the Commissioners harbored
2  ill will towards him in order to meet the 'intent'
3  requirement of his 'class of one' claim.  Instead,
4  Gerhart must show that the Commissioners intended to
5  treat him differently from other applicants." (internal
6  citation omitted)).

7

8      Disparate government treatment will survive rational
9  basis scrutiny "as long as it bears a rational relation
10 to a legitimate state interest."  Squaw Valley Dev. Co.
11 v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004) overruled
12 on other grounds as recognized by Erickson v. Cnty. of
13 Nevada ex rel. Bd. of Supervisors, 2015 WL 3541865, at *1
14 (9th Cir. June 8, 2015); see also SeaRiver Mar. Fin.
15 Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir.
16 2002) (in a "class of one" claim, the defendant's conduct
17 "comports with equal protection if there is any
18 reasonably conceivable state of facts that could provide
19 a rational basis for the classification." (internal
20 quotation marks and citations omitted)).

21

22     Moreover, "[w]here an equal protection claim is based
23 on 'selective enforcement of valid laws,' a plaintiff can
24 show that the defendants' rational basis for selectively
25 enforcing the law is a pretext for 'an impermissible
26 motive.'"  Squaw Valley, 375 F.3d at 944; see also
27 Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th
28

Cir. 1995) ("Selective enforcement of valid laws, without more, does not make the defendants' action irrational.").

The Ninth Circuit has stated that "the rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction,* rather than the underlying government *action.*" <u>Gerhart</u>, 637 F.3d at 1023 (citation omitted).

### 3.  The Applicability of <u>Olech</u>, <u>Gerhart</u>, and <u>City of Walnut Creek</u>

Defendants argue that Massoud cannot prevail on his "class of one" claim because, to the extent it treated him differently than Amber's, the decision had a rational basis.  Some background concerning "class of one claims" in zoning contexts is helpful to understand Massoud's claim.

In <u>Olech</u>, the plaintiffs requested that the village connect her property to the municipal water supply.  528 U.S. at 563.  The village agreed to do so, but on the condition that the plaintiffs provide the city a thirty-three foot easement over their property.  <u>Id.</u>  Plaintiffs protested, claiming that the village only required a fifteen foot easement from other property owners seeking access to the water supply.  <u>Id.</u>  Though the village ultimately provided water service to plaintiffs on

condition of providing a fifteen foot easement,
plaintiffs brought suit against the village, alleging
that the village's request for a thirty-three foot
easement was "irrational and wholly arbitrary" and was
actually motivated by ill will stemming from plaintiffs'
successful lawsuit against the village in the past.  <u>Id.</u>

    The Supreme Court held that plaintiffs could state a
claim against the village for violation of their equal
protection rights, because the village demanded a larger
easement than other similarly situated property owners,
and because the request for a larger easement was
"irrational and wholly arbitrary," in light of the fact
that the village ultimately only needed a fifteen foot
easement to connect the water supply.  <u>Id.</u>

    <u>Gerhart</u> addressed similar allegations.  There, a
landowner sought permission from the county and its
commissioners to build an approach (essentially, a
driveway connecting his property to the public road).
637 F.3d at 1014-15.  The county denied his request for a
permit, despite the undisputed testimony of the plaintiff
that at least ten of his neighbors built un-permitted
approaches, without consequence.  <u>Id.</u> at 1015, 1022.
Sometime before the dispute about the landowner's
approach, he also had "a difficult history with the

County" and had "complaints lodged against him by
neighbors . . . ."  Id. at 1022.

The Ninth Circuit reversed a grant of summary
judgment in favor of the county commissioners on the
landowner's "class of one" equal protection claim,
finding that the landowner's evidence that he was treated
differently than at least ten similarly situated property
owners, coupled with disputed evidence that the
commissioners had an illegitimate reason to single him
out based on his checkered past with his neighbors, was
sufficient to defeat summary judgment.  Id. at 1022-23.
The Ninth Circuit also rejected the commissioners'
contention that they had a rational basis to treat the
landowner differently, finding that their stated reasons
for denial were not rational.  Id. at 1023-24.

Here, Ross's decision not to require Amber's to apply
for a CUP, in light of the letter Arnold had issued, was
rational.  So too was Coyle's agreement with that
decision.  When faced with Massoud's inquiry regarding
Amber's operation without a CUP, Ross faced a dilemma:
he could require Amber's to obtain a CUP and face the
prospect of litigation based on Amber's good-faith belief
that no CUP was required, or he could extend Massoud the
same privilege, thereby compounding Arnold's error.
Deciding to uphold County zoning rules prospectively,

1   instead of making an unauthorized and unilateral decision

2   to allow Massoud to operate without a CUP, was a rational

3   decision under the circumstances.

4

5       Massoud cites Prof'l Care Mgmt., Inc. v. City of

6   Walnut Creek, 2005 WL 2318965 (N.D. Cal. Sept. 21, 2005)

7   to support his position that his allegations are

8   sufficient to support a "class of one" equal protection

9   claim.  In Walnut Creek, the plaintiff was a retail store

10  operator who used outdoor displays to sell merchandise.

11  Id. at *1.  The plaintiff alleged that the city

12  selectively enforced an ordinance restricting outdoor

13  signage against her while allowing large chain-store

14  merchants to violate the ordinance with impunity.  Id.

15  Moreover, the plaintiff alleged that after she complained

16  about the uneven enforcement, the city enforced the

17  ordinance even more rigidly against her and refused to

18  investigate its discriminatory enforcement tactics.  Id.

19  The district court denied the city's motion to dismiss,

20  finding that the plaintiff's allegations concerning

21  enforcement of the sign ordnance were sufficient to state

22  an equal protection claim on a "class of one" theory.

23  Id. at *2.

24

25      The circumstances of the instant case do not fit

26  neatly into what seems to be the traditional "class of

27  one" land-use claim as in Olech, Gerhart, and Walnut

28

48

1  <u>Creek</u>, in which a landowner, who has an uneasy
2  relationship with a municipality, asks for some kind of
3  accommodation because the landowner's neighbors have
4  received the same treatment.  When the municipality
5  refuses to grant that accommodation, for reasons that
6  appear to be unconnected to the merits of the
7  accommodation request, the plaintiff files a "class of
8  one" equal protection claim.
9
10     In the Court's view, Massoud's claim for
11 discrimination is even more attenuated than those in
12 <u>Olech</u>, <u>Gerhart</u>, and <u>Walnut Creek</u>.  This is not a
13 situation in which Massoud applied for a CUP, or
14 requested a lower-cost or expedited CUP application
15 process, but was denied by the County despite the fact
16 that a similarly situated competitor was given the same
17 privileges.[14]  Moreover, it is undisputed that Amber's was
18 required to apply for and receive a CUP when it sought to
19 move locations.  Again, there is no evidence that the
20 County expedited this process to intentionally
21 discriminate against Massoud alone.
22
23
24 _____
25     [14]   It is for this reason that Defendants' arguments
   concerning <u>Engquist</u>'s disapproval of "class of one"
26 claims in instances of discretionary decisionmaking is
   inapplicable.  (<u>See</u> MSJ at 11; Reply at 5.)  Here, there
27 was no discretionary decision — like the approval of a
   CUP — under consideration, only Ross's refusal to allow
28 Massoud to operate without a CUP.

1    As the Ninth Circuit has stated, "[a] class of one
2  plaintiff must show that the discriminatory treatment
3  'was intentionally directed just at him, as
4  opposed . . . to being an accident or a random act.'" <u>N.</u>
5  <u>Pacifica LLC v. City of Pacifica</u>, 526 F.3d 478, 486 (9th
6  Cir. 2008) (quoting <u>Jackson v. Burke</u>, 256 F.3d 93, 96 (2d
7  Cir. 2001)).  On these facts, it is fair to say that any
8  discrimination Massoud experienced was accidental and
9  unintentional.  There is no evidence that Arnold knew
10 Massoud had inquired about a CUP application for the Dos
11 Lagos area in 2007, or that Ross or Coyle continued to
12 allow Amber's to operate without a CUP in order to
13 discriminate against Massoud, on account of his ethnicity
14 or otherwise.

15

16   Accordingly, as Massoud has presented no genuine
17 issue of material fact as to his "class of one" equal
18 protection claim against Ross or Coyle, the Court GRANTS
19 the Motion as to this claim.

20
21
22
23
24
25
26
27
28

1

**VI. CONCLUSION**

2         For the reasons stated above, the Court GRANTS the

3 MSJ, in its entirety.

4

5 Dated: September 10, 2015

6                                        VIRGINIA A. PHILLIPS
                                United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28